IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | UNDER SEAL |
| v. | * | |
| DAREN CONDREY, | * | CASE NO. 14-2423 CBD |
| Defendant | * | |
| | * | |
| | * | |
| UNITED STATES OF AMERICA | * | |
| v. | * | |
| CAROL CONDREY, | * | CASE NO. 14-2424 CBD |
| Defendant | * | |
| | * | |
| | * | |
| | * | CASE NO. 14-2425 CBD |
| | * | |
| | * | |
| UNITED STATES OF AMERICA | * | |
| v. | * | |
| BORIS RUBIZHEVSKY, | * | CASE NO. 14-2426 CBD |
| Defendant | * | |

...ooOoo...

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Your Affiant, David Gadren, Special Agent of the Office of Inspector General ("OIG"), United States Department of Energy ("DOE"), being duly sworn, deposes and states as follows:

### INTRODUCTION

1.      I am an "investigative or law enforcement officer" of the United States, within the meaning of Section 2510 (7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Sections 1341 (wire fraud), 1343 (wire fraud), 1346 (honest services fraud), 1349 (conspiracy to commit mail, wire, and honest services fraud), 1951 (Extortion), 1956 and 1957 (money laundering), 2

1



(Aiding and Abetting), and related offenses.

2. I have been employed by the DOE-OIG since October 2008, and have been assigned
to the National Capital Field Office during this time period. I am currently assigned
as a Task Force Officer ("TFO") to the Federal Bureau of Investigation ("FBI") at the
FBI's Washington Field Office ("WFO"). I have received formal training in the
investigation of financial crimes, including wire fraud, money laundering, and
extortion, corruption, and related fraud offenses at the Federal Law Enforcement
Training Center in Glynco, Georgia, and at various other training organizations. I
have participated in numerous criminal investigations involving financial fraud,
money laundering, various other white collar crimes, fugitive apprehensions, and
other unlawful activities. In addition, I have participated in investigations involving
consensually recorded conversations. I have participated in numerous debriefings of
individuals involved in these criminal activities and worked with confidential human
sources. I have also participated in numerous searches, arrests, and seizure warrants
involving a variety of federal offenses.

3. I have personally participated in the investigation of the offenses referred to herein
and reviewed reports and had discussions with other Special Agents and employees of
the FBI, DOE-IG, and other law enforcement agencies related to the instant
investigation. I am fully familiar with the facts and circumstances of this

from other investigators, my and other investigators' review of documents in relation to this investigation, communications with others, including individuals involved in mail/wire fraud, money laundering, extortion, and related offenses, more fully described below, who have personal knowledge of the events and circumstances described herein, information gained from the review of subpoenaed electronic communications and financial records, cooperating sources, and information gained through your Affiant's training and experience.   To the extent that this affidavit contains statements by witnesses, those statements are set forth only in part and in substance and are intended to accurately convey the information, but not to be verbatim recitations, unless indicated otherwise.  This affidavit is submitted for the limited purpose of establishing probable cause in support of an application for a criminal complaint, and thus, it does not contain every fact known by me or the United States.

5. This affidavit is submitted in support of criminal complaints charging Daren CONDREY ("D. CONDREY"), Carol CONDREY ("C. CONDREY"), ▮▮▮▮ ▮▮▮▮▮▮▮ and Boris RUBIZHEVSKY ("RUBIZHEVSKY") with one count of conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349.

6. Your Affiant submits that the facts and circumstances set forth in this Affidavit demonstrate that there is a probable cause to believe that D. CONDREY, C. CONDREY, ▮▮▮▮ and RUBIZHEVSKY have conspired with each other and with others to commit wire fraud in violation of 18 U.S.C. § 1349

**Overview of Investigation**

7.  This case is being investigated by DOE-IG, FBI, and other federal and local law enforcement agencies.  Your affiant has personally participated in this investigation and makes this affidavit based upon my personal participation in this investigation and based upon reports made to your affiant by other law enforcement officers and authorities, as well as information provided to them by the confidential informants. The information set forth in this affidavit has been provided by your affiant or to your affiant by other law enforcement agents/officers who have assisted in the investigation and have knowledge of the information set forth herein.

## STATEMENT OF PROBABLE CAUSE

### *Individuals and Entities Involved in Fraud Scheme*

8. VADIM MIKERIN is a national of the Russian Federation residing legally in the United States on an L1 visa at 5600 Wisconsin Avenue, Apartment 302, Chevy Chase, Maryland.

9. Since in or about 2010, MIKERIN has been employed as the general director of TENAM USA ("TENAM"), which is based in Bethesda, Maryland and registered as a corporation.

10. TENAM is a subsidiary of JSC TECHSNABEXPORT ("TENEX"), which is based in Moscow, Russian Federation.

11. TENEX is a subsidiary organization of ROSATOM, the Russian State-owned Nuclear Corporation, which is a counterpart organization of DOE in the Russian Federation. DOE and ROSATOM are the respective "executive agents" for an agreement executed in or about 1992 by the United States and the Russian Federation (the "Agreement"). The Agreement concerned the disposition of Russian highly enriched uranium ("HEU") from disassembled nuclear warheads and the sale of that material, once down-blended, to U.S. nuclear utility providers. TENEX was the Russian "commercial agent" responsible for the sale and transportation of this material to the United States. Through investigation, your Affiant knows that MIKERIN was integral to the execution and operation of the Agreement, as discussed

negotiations between the entities.   In the course of these business negotiations, MIKERIN has direct contact with U.S. persons and companies seeking to do business in Russia with TENEX.   Accordingly, your Affiant knows that TENAM is engaged in interstate and international commerce activities involving the sale of Russian nuclear fuel to U.S. nuclear utility providers.

13. Transport Logistics International ("TLI"), based in Fulton, Maryland, and is a Maryland registered Corporation located at 8161 Maple Lawn Boulevard, Suite 450, Fulton, Maryland.

14. TLI participated in the HEU Agreement by transporting Russian uranium from the Russian Federation to the United States.   Under this arrangement, TLI subcontracted with both TENEX in Moscow, Russian Federation, and the United States Enrichment Corporation ("USEC") based in Bethesda, Maryland, which was the United States' principal commercial agent for the HEU Agreement.

15. D. CONDREY, born ███████ 1965, is a resident of Maryland and lives at ███ ███████ Glenwood, Maryland ████   D. CONDREY is co-president of TLI with ██████ and has been since 2010.

16. C. CONDREY, born ██████ 1965, is a resident of Maryland and lives at ███ ██████ Glenwood, Maryland████   C. CONDREY serves as TLI's financial manager and is married to D. CONDREY.

17. ████████████████████████████████████████████



18. Co-Conspirator One was the president and founder of TLI and served in that role from 2006 until 2010, when he was replaced by Condrey and ▮▮▮▮ Co-Conspirator One served as a consultant to TLI thereafter until his death in 2011.

19. RUBIZHEVSKY, born ▮▮▮▮ 1950, is a resident of New Jersey and lives at ▮▮▮▮ Closter, New Jersey ▮▮▮▮ RUBIZHEVSKY is the President of NEXGEN SECURITY ("NEXGEN"), a company registered in New Jersey at the same address as his residence denoted above. NEXGEN appears to have no employees besides RUBIZHEVSKY and has no physical operating location besides the latter's residence.

20. Corporation One is based in Bremen, Ohio and is registered as a corporation in the State of Ohio.

21. Co-Conspirator Two is the Vice President of Corporation One, and is a resident of ▮▮▮▮ residing at ▮▮▮▮

22. From in or about 2011 through in or about 2012, RUBIZHEVSKY has served as a consultant to TENAM and to MIKERIN, through his self-incorporated business NEXGEN, which is registered to RUBIZHEVSKY at Closter, New Jersey, which your Affiant knows is RUBIZHEVSKY's home address.

### *The Conspiracy*

23. Your affiant knows through investigation, including review of the co-conspirators' e-mails, voluminous financial records, public source databases, law enforcement databases, and other information, that beginning at least as early as 2006, MIKERIN combined, conspired, confederated and agreed with D. CONDREY, C. CONDREY, ▮▮▮▮ and RUBIZHEVSKY, and others to defraud TENEX, by MIKREN



fraudulently causing TENEX to enter into contracts for the shipment of uranium from Russia to the United States with businesses under the control and influence of D. CONDREY, C. CONDREY, █████████ Co-Conspirator One, and RUBIZHEVSKY, and others, in exchange for D. CONDREY, C. CONDREY, █████████ and RUBIZHEVSKY, and others, utilizing interstate wires to provide money to MIKERIN, all in violation of Title 18, United States Code, Section 1349.

24. As part and in furtherance of the conspiracy and scheme to defraud, MIKREN and others ensured that D. CONDREY, C. CONDREY, █████████ Co-Conspirator One, RUBIZHEVSKY, and others secured unfair advantages in contractual bids under the Agreement by ensuring that TLI, NEXGEN SECURITY, and other companies received uranium transportation contracts from TENEX without having to compete for the contracts.

### *D. CONDREY, C. CONDREY, and* █████████ *Role in the Conspiracy*

25. Since in or about 1996, TLI has contracted with TENEX to transport uranium from the Russian Federation to the United States under the Agreement, which was overseen by DOE on behalf of the U.S. government. TLI continued this contractual relationship with TENEX through 2013, when the Agreement expired.

26. From at least in or about 1996 through in or about 2013, TLI received contracts without disruption for transporting uranium under the Agreement from TENEX. During the conspiracy, TLI has also pursued other business ventures with TENEX for transportation under separate contracts. In total, since at least 2006, TLI has received approximately $33,026,838.68 from TENEX.

8



27. As detailed below, through the investigation, your Affiant has learned that beginning no later than 2006, and continuing through present, Co-Conspirator One, D. CONDREY, C. CONDREY,  and others caused TLI to provide "kickbacks" in the form of cash payments to MIKERIN in exchange for lucrative, non-competitive contracts from MIKERIN's employer, TENEX. TLI officers, including Co-Conspirator One, D. CONDREY, C. CONDREY, and others, made these kickback payments by wire transfer from the District of Maryland to several offshore entities, including, among others, "WISER TRADING LIMITED," which is based in the Republic of Seychelles (with bank accounts in Nicosia, Cyprus); "LEILA GLOBAL LIMITED," which is based in the United Kingdom (with a bank account in Riga, Latvia), and "OLLINS DEVELOPMENT LIMITED," which is based in Switzerland (with a bank account in Switzerland).

28. Through investigation, including review of e-mails from and among the co-conspirators and voluminous financial records, your Affiant has determined that WISER TRADING LIMITED ("WISER"), LEILA GLOBAL LIMITED ("LEILA"), and OLLINS DEVELOPMENT LIMITED ("OLLINS") are "sham" entities (as discussed in greater detail below) utilized by the co-conspirators in order to facilitate the kickback payments to MIKERIN and others.

29. WISER, a now-defunct corporation, was incorporated in the Republic of Seychelles, but its bank accounts were in Cyprus. WISER's primary director was a Russian national.

30. LEILA is incorporated in the United Kingdom, but its bank accounts are in Latvia. LEILA's primary director is a Russian national.

31. In coordination with Latvian and United Kingdom law enforcement authorities, your Affiant has reviewed financial and other corporate information provided by foreign law enforcement partners assisting with this investigation. Through my review, your Affiant has determined that LEILA and WISER are managed by a Cyprus-based, shell holding company connected with two Latvian national directors. Those two single individuals maintain nominee control of thousands of companies registered in various offshore jurisdictions that are used for a variety of purposes, both legal and illegal.

32. Additionally, your Affiant has learned that LEILA has been deemed a "shell" company – or a company that has no discernable business operations, employees, or physical location and whose beneficial owners are obscure in many cases – by business registration authorities in the United Kingdom, as indicated on information received from the United Kingdom Companies House, a public ledger of companies registered in that country.

33. Your affiant has learned through investigation that it was further part of the conspiracy and scheme to defraud that MIKERIN would have his co-conspirators, including Co-Conspirator One, D. CONDREY, C. CONDREY, ████████ and others, disguise the kickback payments to MIKERIN as consulting fees or other fictitious expenses. Further, MIKERIN, working with Co-Conspirator One, D. CONDREY, C. CONDREY, ████████ and others would enter into "sham" contracts with offshore "shell" entities such as LEILA, WISER, and OLLINS, knowing that the payments to these entities by TLI (caused by Co-Conspirator One, D. CONDREY, C. CONDREY, ████████ and others) were in fact being made to



MIKERIN and others in return for their assistance in ensuring that TLI would continue to receive noncompetitive contracts for the shipment of uranium to the United States from TENEX.

34. Through the review of voluminous financial records, your Affiant has determined that, since 2006, Co-Conspirator One, D. CONDREY, C. CONDREY, █████████ and others have caused TLI to pay at least $1,692,995.91 in kickback payments to MIKERIN through these offshore entities (LEILA, WISER, and OLLINS), in exchange for MIKERIN ensuring that TLI would receive and continue to receive noncompetitive contracts from TENEX, which were worth approximately $33,026,838.68.

35. Based upon a review of subpoenaed documents obtained from Sandy Spring Bank, based in Maryland, which is TLI's primary bank, as well as from the Federal Reserve Bank of New York, your Affiant has determined that from 2009 through the present, Co-Conspirator One, D. CONDREY, C. CONDREY, █████████ and others have caused TLI to make the following wire transfer "kickback" payments from Maryland to certain offshore companies for MIKERIN's and others' benefit pursuant to the wire fraud conspiracy:

| Date | To | Recipient | Financial Institution | Amount (USD) |
|---|---|---|---|---|
| April 15, 2009 | Alpha Bank Ltd, Cyprus | Wiser | Sandy Spring | 28,069.00 |
| May 22, 2009 | Alpha Bank Ltd, Cyprus | Wiser | Sandy Spring | 49,058.00 |
| July 29, 2009 | Alpha Bank Ltd, Cyprus | Wiser | Sandy Spring | 13,960.00 |
| October 30, 2009 | Alpha Bank Ltd, Cyprus | Wiser | Sandy Spring | 49,206.50 |
| December 3, 2009 | Alpha Bank Ltd, Cyprus | Wiser | Sandy Spring | 8,157.00 |
| April 12, 2009 | Alpha Bank Ltd, Cyprus | Wiser | Sandy Spring | 17,145.75 |
| June 23, 2010 | Alpha Bank Ltd, Cyprus | Wiser | Sandy Spring | 51,096.50 |
| September 9, 2010 | Eurobank EFG, Cyprus | Wiser | Sandy Spring | 80,756.31 |
| November 4, 2010 | Eurobank EFG, Cyprus | Wiser | Sandy Spring | 47,048.79 |

11



| December 15, 2010 | Eurobank EFG, Cyprus | Wiser | Sandy Spring | 25,371.40 |
| February 15, 2011 | Eurobank EFG, Cyprus | Wiser | Sandy Spring | 29,724.50 |
| April 11, 2011 | Eurobank EFG, Cyprus | Wiser | Sandy Spring | 62,227.88 |
| July 7, 2011 | ABLV Bank AS (Latvia) | Leila | Sandy Spring | 49,176.81 |
| September 27, 2011 | ABLV Bank AS (Latvia) | Leila | Sandy Spring | 81,397.21 |
| December 22, 2011 | ABLV Bank AS (Latvia) | Leila | Sandy Spring | 125,930.53 |
| March 29, 2012 | ABLV Bank AS (Latvia) | Leila | Sandy Spring | 48,089.30 |
| May 25, 2012 | ABLV Bank AS (Latvia) | Leila | Sandy Spring | 121,962.33 |
| August 30, 2012 | ABLV Bank AS (Latvia) | Leila | Sandy Spring | 108,950.80 |
| December 18, 2012 | ABLV Bank AS (Latvia) | Leila | Sandy Spring | 142,204.30 |
| July 11, 2013 | ABLV Bank AS (Latvia) | Leila | Sandy Spring | 95,833.55 |
| May 6, 2013 | Hyposwiss Privatbank AG, Switzerland | Ollins | Sandy Spring | 25,774.00 |
| August 30, 2013 | Hyposwiss Privatbank AG, Switzerland | Ollins | Sandy Spring | 94,102.00 |
| October 30, 2013 | Hyposwiss Privatbank AG, Switzerland | Ollins | Sandy Spring | 77,896.00 |
| November 8, 2013 | Hyposwiss Privatbank AG, Switzerland | Ollins | Sandy Spring | 62,457.93 |
| December 16, 2013 | Hyposwiss Privatbank AG, Switzerland | Ollins | Sandy Spring | 57,713.42 |
| March 28, 2014 | Hyposwiss Privatbank AG, Switzerland | Ollins | Sandy Spring | 28,504.00 |
| May 30, 2014 | Hyposwiss Privatbank AG, Switzerland | Ollins | Sandy Spring | 28,637.00 |

36. Your Affiant has reviewed several e-mail search warrants authorized by the United States District Court for the District of Maryland for accounts controlled by MIKERIN and determined that e-mails reveal a large amount of correspondence between MIKERIN, Co-Conspirator One, D. CONDREY, C. CONDREY, ▆▆▆▆ RUBIZHEVSKY, and others describing in detail the scheme and referring to the above-referenced "kickback" payments utilizing euphemistic terms such as "LF" [suspected to be shorthand for "LEILA funds" after the original shell entity used by MIKERIN and TLI during the scheme] and "Cake."



37. Specifically, your Affiant has identified several e-mails between MIKERIN and D. CONDREY (dcondrey@tliusa.com), through which they appear to negotiate a mutually agreed-upon value of "Cake" or "LF" to be applied to an existing or upcoming contract.   Your Affiant believes, based upon investigation, that D. CONDREY and MIKERIN, through these emails, are, in fact, negotiating the amounts of the kickback payments from TLI to MIKERIN.

38. On or about January 23, 2010, MIKERIN sent an email to Co-Conspirator One as he left control of TLI.  Relating to whether or not the kickback scheme would continue with TLI after Co-Conspirator One's departure, MIKERIN further asked "Daren [CONDREY] & ▓▓▓▓▓ new company policy or not? Our Cake situation and full understanding between them and me[?]"  Co-Conspirator One responded to MIKERIN to the effect that both CONDREY and ▓▓▓▓▓ wished to continue with the kickback arrangement.

39. On or about April 16, 2011, MIKERIN emailed Co-Conspirator One, stating, "Just to brief you that Wiser has confirmed their readiness to release Carol's [CONDREY] parcel early next week… Hopefully your action tomorrow with BofA to Leila also will allow us to get everything in due time next week."

40. On or about April 19, 2011, MIKERIN emailed Co-conspirator One stating, "Carol's [CONDREY] cake has been duly received.  Thank you very much.  Leila – not yet but it's early for a while.  I'll inform you shortly."  Your Affiant believes that in this email, MIKERIN is informing Co-Conspirator One that a kickback payment has been provided to him by C. CONDREY on behalf of TLI, and is further providing information on additional shell accounts to receive the kickback payments.



41. On or about June 11, 2011, MIKERIN sent an email to Co-Conspirator Two saying, "If Daren [CONDREY] is traveling next week, which is predictable, please contact ▓▓▓▓▓▓▓▓ he knows the rope [sic]…" On or about November 5, 2011, MIKERIN sent another email to Co-Conspirator Two directing him to send the "consulting agreement" to ▓▓▓▓▓ should CONDREY be traveling, as ▓▓▓▓▓ "knows the ropes."

42. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

43. This is further detailed in an e-mail dated November 6, 2013, in which D. CONDREY emailed MIKERIN, stating, "I was thinking 5% Surcharge for processing and bank fees, etc. Please be frank with me on your thoughts, will not offend me at all." MIKERIN replied the same day via e-mail, "All should be fair in this arrangements [sic] so let me propose 7-10% from what you get from [Co-Conspirator 2] especially if we can resolve it finally by the end of November." Your Affiant believes that in these e-mail exchanges, D. CONDREY and MIKERIN are negotiating the amounts of kickbacks to be made to MIKERIN via TLI.



44. On or about November 29, 2013, Corporation One made a check in the amount of $30,900 payable to TLI.

45. On or about December 6, 2013, TLI deposited the $30,900 check into its bank account.  In reviewing the financial records of these banks and entities, your Affiant has determined that pursuant to the agreed upon 7% facilitation fee awarded by MIKERIN to TLI for facilitating the transfer of Company One's kickback payments to MIKERIN, TLI retained 7% of the payment received from Corporation One, or $2,163, and forwarded the remainder, or $28,737, to OLLINS on or about December 16, 2013, by incorporating the sum into TLI's own regular kickback payment due to TENEX.

46. On or about April 26, 2013, MIKERIN emailed D. CONDREY, "Please find new instructions how to proceed with the Ollins Develp.  It's open for the next week.  The invoice for 25k will be sent on Mon."  Your Affiant believes that in this email, MIKERIN was providing D. CONDREY with a new account to which TLI was to wire kickback payments (OLLINS).  Through the course of this investigation, your Affiant has learned that MIKERIN regularly refers to invoices which appear to correspond to "sham" invoices that MIKERIN has caused to be generated to attempt to make kickback payments appear to be legitimate business expenses incurred by the shell companies.

47. On or about May 6, 2013, TLI wired $25,774 to OLLINS in Switzerland.

CONDREY's full familiarity and participation in the scheme on behalf of TLI. This is both because TLI would have no legitimate business reason to pay TENEX – which company pays it to transport nuclear materials – but also because TLI would have no legitimate business reason to pay TENEX through an intermediary entity such as LEILA, OLLINS, or WISER. This email indicates that C. CONDREY is fully aware that payments made to the shell companies are being paid either as kickbacks on the TENEX contract, paid to corrupt directors or employees of TENEX, or both..

49. Also on or about May 6, 2013, D. CONDREY forwarded the same email to MIKERIN, stating, "See below – done today." MIKERIN responded via e-mail the same day, "Got from you. Thanks much." Your Affiant believes that in this email, D. CONDREY is providing confirmation of a transferred kickback payment to TENEX at Mikerin's behest by TLI.

50. On or about October 15, 2013, D. CONDREY emailed MIKERIN saying, "I think we also need to meet, in the near future, to discuss LF in the future. Based on our recent meetings we will have difficulty being competitive with current arrangement." Your Affiant believes that in this email, D. CONDREY was attempting to re-negotiate a previously agreed upon amount for kickbacks to be paid by TLI to MIKERIN, and that D. CONDREY was utilizing the same euphemistic descriptions of the payments in e-mails deliberately, in order to avoid detection. Based on my review of these and other related emails, your Affiant also believes that D. CONDREY was becoming

51. On or about December 23, 2013, D. CONDREY sent MIKERIN an email entitled "LF", which stated, "I grow weary of the threats coming out of Director of Transportation Department, that they will start going out to bid and that there are "Other" transportation companies, as you can imagine the LF added to our quotes is significant. This is due to delay in loading of vessel out of St. Petersburg Russia, not in 2013 getting pushed until 2014, due to weather delays of vessel getting into Russia. Frankly speaking we have not problem with competing [sic], minus the LF, and would in some cases be much simpler." Your Affiant believes that in this email, D. CONDREY is confronting MIKERIN about the excessive dollar amounts of the kickback payments, which TLI is paying to avoid competition on transportation contracts with TENEX, and how they are adversely affecting TLI's profitability. Further, D. CONDREY is alleging that other parties at TENEX are engaging in threats to take action regarding TLI's business relationship with TENEX.

52. On or about June 11, 2014, D. CONDREY emailed C. CONDREY and asked, "Can u get confirmation that monies to Ollin Dev went through after the changes we made?" CAROL CONDREY responded: "Cheryl at Sandy Spring confirmed that the amended information was received by Wells Fargo, who is Sandy Springs' international bank, and the file is 'closed' on 6/6/14." Your Affiant believes that this email contains further evidence that C. CONDREY is involved in the scheme and is

determined that from in or about 2010 through in or about 2011, RUBIZHEVSKY also served as a conduit for kickback payments from Corporation One, which also contracted with TENEX.

54. Your Affiant has reviewed e-mails by and among the co-conspirators as well as voluminous financial records, which demonstrate that, during the time of its contract with TENEX, Corporation One made numerous kickback payments to MIKERIN in exchange for MIKERIN's assistance in circumventing the competitive bid process for supply contracts to TENEX.

55. In or around November 2011, MIKERIN required a "middle man" to accept similar "kickback" payments from Corporation One, which was apparently concerned about its reputation, according to e-mail communications between Co-conspirator One and MIKERIN.  Your Affiant has determined that MIKERIN utilizes RUBIZHEVSKY and his company, NEXGEN SECURITY, to serve as this "middleman" for receiving kickback payments for MIKERIN.

56. Through my review of financial records, your Affiant has learned that Corporation One made a series of payments, which your Affiant believes were disguised as "consulting fees," to NEXGEN, for ultimate payment to MIKERIN in order to obtain a non-competitive supply contract with TENEX.

57. Your Affiant has learned through investigation that MIKERIN arranged for Corporation One to execute a consulting agreement with NEXGEN to make the

58. Your Affiant knows that RUBIZHEVSKY accepted at least two separate payments from Corporation One, a portion of which he then transferred by wire at MIKERIN's request to the same offshore entities that D. CONDREY, C. CONDREY, and ▓▓▓▓▓ caused TLI to make during the conspiracy.

59. On or about July 13, 2012 Corporation One made a check in the amount of $16,500 payable to NEXGEN, which RUBIZHEVSKY deposited to NEXGEN's account on or about July 16, 2012.  On or about November 14, 2012 Corporation One made a check in the amount of $91,500 payable to NEXGEN, which RUBIZHEVSKY deposited to NEXGEN's account on or about November 20, 2012.

60. On or about December 7, 2012, NEXGEN wired $60,000 to LEILA, retaining $48,000 of funds received from Corporation One.  Your Affiant believes that these payments to LEILA were in fact kickback payments for a noncompetitive contract to be earned by Corporation One from TENEX for further product supplies.

61. Your Affiant knows through review of e-mails and related investigation that RUBIZHEVSKY actively assisted MIKERIN in drafting "fake" contract documents for Corporation One in order to help them to evade the competition requirements under Russian law. For example, on or about November 16, 2011, MIKERIN emailed Corporation One's vice president, stating, "I do hope you have got from Boris [RUBIZHEVSKY] all the docs needed to prepare and arrange before my folks come to your office next week... Barry, please execute your Consulting Agreement with NEXGEN (Boris [RUBIZHEVSKY]) to keep everybody in one stream."



62. Through the investigation detailed herein, your Affiant knows that MIKERIN sought to further solidify the contractual relationship between NEXGEN and LEILA by creating sham contracts and "consulting agreements."

63. Specifically, on or about December 9, 2012, RUBIZHEVSKY emailed MIKERIN a "Signed pdf and word version" of a "Leila agreement." Attached to the email was a letter signed by RUBIZHEVSKY "President & CEO" of "NexGen, Inc" and bearing the indecipherable initials of the "Leila LLC Chief Operating Officer." Also attached were bank addresses and routing numbers for Leila Global Limited and Aizkraukles Bank of Latvia. Additionally, attached to the email was an invoice, dated December 5, 2012, for "$90.000,00" [sic] for "Stainless steel." The invoice also stated that a "Revenue Share" between LEILA and NEXGEN would result in "60.000,00" [sic] to LEILA and "30.000,00" [sic] to NEXGEN. Your Affiant believes that this email was a coded communication between RUBIZHEVSKY and MIKERIN to legitimize the transfer of kickback payments and to avoid further scrutiny, presumably from Russian government authorities.

## CONCLUSION

64. Based on the foregoing, there is probable cause to believe that, from in or about 1996 through the present, D. CONDREY, C. CONDREY,             and RUBIZHEVSKY have conspired with each other and others to commit wire fraud, in violation of Title 18, United States Code, Section 1349.



I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

David Gadren
Special Agent
Office of Inspector General
United States Department of Energy

Subscribed and sworn before me this ___29th___ day of October, 2014.

CHARLES B. DAY
UNITED STATES MAGISTRATE JUDGE

